UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD FERGUSON, SR., et al.,

Plaintiff,

v.

CITY OF TAYLOR, et al.,

Defendants.

Case No. 23-12789
Honorable Shalina D. Kumar
Magistrate Judge Kimberly G. Altman

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 17)**

---

## I.      INTRODUCTION

Plaintiffs Richard Ferguson, Sr. ("Ferguson") and Richard Ferguson, Jr. ("Ferguson, Jr.") sued defendants City of Taylor ("City") and City police officers Christopher Cates, Vincent Monaco, and Alex Stellini under 42 U.S.C. § 1983 for unlawful entry, false arrest, and excessive force during an encounter at Ferguson's residence. ECF No. 1. Defendants filed a motion for summary judgment[1] on all claims. ECF No. 17. The motion was

---

[1] Defendants' motion also seeks dismissal under Federal Rule of Civil Procedure 12(b)(6). Such combined or alternative motions are disfavored because they tend to conflate the separate standards for motions to dismiss (considering only the facts alleged in the complaint) and for motions for summary judgment (considering additional evidence supplied

fully briefed, and the Court heard oral argument on March 12, 2025. ECF

Nos. 17, 25, 28, 29, 31. For the reasons set forth below, the Court grants

the motion in part and denies it in part.

## II.   FACTUAL BACKGROUND

On the afternoon of September 15, 2022, defendant police officers

were dispatched to Ferguson's residence after a 911 call reported that a

white male pointed a silver handgun at the caller, Lawrence Behr, during a

dispute in the Ferguson driveway. ECF No. 17-2. Bodycam footage shows

Cates and Monaco arrive at the Ferguson house and receive differing

accounts of the dispute from Behr and Ferguson.  ECF Nos. 17-3, 17-4.

Monaco speaks initially to Behr, who was in his truck in the street in

front of the Ferguson house. *Id.* Behr explains to Monaco that he

purchased plywood from Ferguson's stepson, Nicholas Light, through

Facebook Marketplace. ECF No. 17-3, 00:21-1:54. Behr initially paid for the

plywood and picked up a portion of it the week before, but he could not fit

the entire purchase in his truck. *Id*. Behr and Light agreed that Behr would

return in the following days to collect the remainder of the purchased

plywood, but Behr fell ill with COVID-19 and did not return to pick up the

---

by the parties). *Street v. Berrien Cty. Jail*, 2024 WL 458716 at *1 n.1 (W.D.
Mich. Jan. 11, 2024). Because the parties supplied exhibits outside the
pleadings, the Court will construe this as a motion for summary judgment.

wood as scheduled. *Id*. According to Behr, Light messaged him about picking up the wood and he responded, asking Light to call him so he could explain that he had COVID-19. *Id*. After several days, Behr eventually reached Light, who told Behr that he needed the plywood picked up immediately and that Behr should come to retrieve it notwithstanding his COVID-19 illness. *Id*.

At Light's insistence, Behr returned to the Ferguson residence. *Id.*, 1:55-3:00. Behr tells Monaco that he pulled into the Ferguson driveway, beeped his horn to get the attention of the people outside in the Ferguson yard, rolled down his window, and asked Light's mother and Ferguson's wife, Becky, who was approaching his truck, if her son had informed her that he had COVID-19. *Id*. According to Behr, Becky began yelling at him incoherently and Ferguson, who had also been in the yard, came running through the gate separating the yard from the driveway, and pointed a silver handgun at him. *Id*. Behr reports to Monaco and Cates, who had joined Monaco outside Behr's truck, that Ferguson then lowered the gun to his right side, approached to within three feet of Behr's vehicle, and told him to "get the f**k off my property right now or I'll put one in you!" *Id*. Behr tells the officers that he immediately put his truck in reverse, backed out of the Ferguson driveway, and called 911. *Id*. at 3:00-3:05.

Ferguson, standing at the gate in his yard along with Becky, Light, and Ferguson, Jr., gives his account of the events to Cates. ECF No. 17-4, 1:57-4:47. Ferguson's version of the story corresponds with Behr's until his arrival at the Ferguson house that day. *See id*. According to Ferguson, Behr accelerated up the driveway, slamming on his brakes just before hitting one of Ferguson's parked cars, and leaned on his horn. *Id*. Ferguson tells Cates that Behr immediately began shouting profanities and denigrating Light for insisting he pick up the plywood despite being sick with COVID-19. *Id*. Ferguson told Behr to "get the f**k out of here," and Behr backed out of his driveway to the street where he remained. *Id*. Ferguson reports that his neighbor across the street had been outside getting his mail and observed the entire encounter between him and Behr. *Id*. Ferguson denies having a gun when Cates directly asks him if he pointed a gun at Behr but admits that he has an old shot gun in the back of his closet. *Id*. at 4:48-5:45.

After listening to Ferguson's account, Cates joins Monaco in questioning Behr. *Id*., 6:15-9:07. Behr flatly denies Cates' suggestion, based on Ferguson's assertion, that he revved up the driveway, blowing his horn and cursing at the people in the yard, and reiterates his version of the encounter with Ferguson. *Id*.

Cates briefs the newly arrived Stellini, describing the situation as "a lot of he said/she said." *Id.* at 9:50-11:02. Stellini joins Monaco in questioning the witnessing neighbor, who had been checking his mail across the street from the Ferguson house around the time that Behr arrived. ECF No. 17-3, 6:19-10:50. The neighbor recounts that he was back in his house when he heard a vehicle pull in the Ferguson driveway "aggressively," squealing its tires, and then heard Becky yelling. *Id*. He looked out the window and saw Behr and Becky yelling at one another. *Id*. He saw Ferguson come out of the front door of the house and walk to the fence to the yard, then Behr reversing quickly down the driveway to the street. *Id*. The neighbor indicates that Light and Becky were in the yard and that Ferguson was standing at the fence when he yelled for Behr to get off his property. *Id*. He states that never saw Ferguson or anyone from the Ferguson household approach Behr's truck. *Id*. The neighbor reports that he did not see anyone point a gun at anyone else and denies seeing a firearm, noting that he would not have been able to see it from his vantage point. *Id*.

On Stellini's instruction, Monaco searches the state data base for any weapon registered to Ferguson. Monaco finds a 9mm Beretta handgun registered to a Steven Light at the Ferguson address. *Id.*, 11:52-16:22.

Believing Light, the young man they saw in the yard, to be Steven Light, Monaco and Cates return to the Ferguson yard to ask about the handgun. *Id*. at 16:22-17:05. Cates asks "Steven" to come out of the yard to talk to them. *Id*. at 17:43-17:55. Ferguson answers for Light, saying he can talk to them from where he is standing behind the fence in the yard and that his name is Nick. *Id*. Monaco asks if there is a Steven who lives there, but Ferguson simply points to Light and says, "this is Nicholas." *Id*. Cates and Monaco return to the computer in the squad car and determine that both Steven Light and Nicholas Light, apparently brothers, live at the Ferguson address. *Id.* at 18:15-19:18.

Stellini tells Cates and Monaco that they will get a search warrant on the house. He also decides that they will first try to get Ferguson to talk to them on the other side of the fence but, if Ferguson refuses, that they will arrest him. *Id.* at 27:45-27:59 ECF No. 25-2, PageID.633-34.

With Cates and Monaco behind him, Stellini approaches the yard where Ferguson and Ferguson, Jr. are standing just behind the fence. ECF No. 17-5, 27:10-27:24. Stellini tells Ferguson "to come over here, Sir, so we can go ahead with this." *Id.* Ferguson and Becky, who is also standing in the yard, ask, "go ahead with what?" and Ferguson turns around, walking further into his yard toward the house. *Id*., 27:29-33. Defendant officers

acknowledge that they never communicated to Ferguson that he was under arrest. *See* ECF Nos. 17-10, PageID.510; 17-15, PageID.557; 17-16, PageID.578-79.

Stellini opens the latch to the gate and begins to enter the yard as he pushes the gate open. *Id*., 27:33; ECF No. 17-3, 32:18. Becky yells for the officers to get out. ECF No. 17-5, 27:35. Ferguson, Jr., who was standing next to the gate, reaches for the gate to close it before Stellini can fully enter the yard. *Id.*, 27:34. Stellini continues to push the gate open, eventually colliding with Ferguson Jr., who maintains his grip on the gate. ECF No. 17-4, 36:14-16; ECF No. 17-3, 32:19-22. Stellini appears to lower his shoulder into Ferguson, Jr., pushing him from the gate into the exterior wall of the house. ECF No. 17-4, 36:16-17; ECF No. 17-3, 32:21-22.

Cates and Monaco follow Stellini through the gate into the Ferguson yard. ECF No. 17-4, 36:15-16[2]; ECF No. 17-3, 32:22. Bypassing the scuffle between Stellini and Ferguson, Jr., Cates and Monaco pursue Ferguson toward the sliding door into the house. ECF No. 17-4, 36:16-18; ECF No. 17-3, 32:22-24. Ferguson enters the house through the sliding door and

---

[2] Cates appears to turn off the microphone of his bodycam when talking to Monaco, approximately eight minutes before the officers enter Ferguson's yard. ECF No. 17-4, 28:17-21. The final 21 minutes and 19 seconds of the footage from his bodycam has no audio. *Id*. at 28:21-49:40.

closes it. ECF No. 17-4, 36:18-19. Cates opens the sliding door, encountering Ferguson immediately inside the house. *Id.*, 36:21-22. Cates and Ferguson have a physical altercation, and Ferguson admits in his deposition that he choked Cates by grabbing him by the neck. *Id.*, 36:22-24; ECF No.17-6, PageID.254. Monaco enters the house and deploys his Taser, immobilizing Ferguson and causing him to fall backwards onto the floor. ECF No. 17-3, 32:28-35. Monaco leaves Cates to secure Ferguson, returning to the yard to assist Stellini in subduing Ferguson, Jr. *Id.*, 32:34-37.

Cates's bodycam shows him point his service pistol at Ferguson, who is in an awkward, reclined position on the floor, pinned between a bookshelf and a wall. ECF No. 17-4, 36:30-38. Cates grabs Ferguson by the neck and shirt, continues to point his gun at him, and forces him face down to the floor. *Id.* at 36:38-44. Although Ferguson appears to be unmoving and in a prone position on the floor, Cates appears to deploy his Taser directly into Ferguson's back before handcuffing his wrists behind his back. *Id.* at 36:58. As Cates handcuffs Ferguson, Light begins video recording Cates and Ferguson with his smart phone. ECF No. 17-7. The recording captures Cates dragging Ferguson, who is screaming in pain, across the floor and onto his deck. *Id.* at 0:20-1:34.

Meanwhile, when Monaco comes upon Stellini and Ferguson, Jr. after exiting the house, Stellini has hooked Ferguson, Jr.'s right arm, and has him in a chokehold. ECF No. 17-3, 32:37. They fall backwards, Stellini on the ground with Ferguson, Jr. on top of him. *Id.*, 32:38-40. Monaco advances on them with his Taser drawn and deploys it against Ferguson, Jr., just after he raises his hands and calls out in surrender. *Id.* at 32:37-46. Stellini handcuffs Ferguson, Jr. and he is placed in a patrol vehicle. ECF No. 17-5, 28:16-34:46.

Ferguson and Ferguson, Jr. were taken into custody and charged with resisting, obstructing, and assaulting an officer. Ferguson was also charged with felonious assault. Plaintiffs were bound over on the resisting, obstructing, and assaulting charges and ultimately accepted plea deals before initiating this action.

Ferguson alleges that defendant officers' entry into his fenced-in yard and residence to accost and detain Ferguson and Ferguson, Jr. constituted an illegal search and seizure, unlawful detainment, and excessive force, thereby violating their Fourth amendment rights.[3] ECF No. 1. Plaintiffs further allege that the City violated their constitutional rights by maintaining

---

[3] Counsel for plaintiffs clarified at the hearing on defendants' motion that plaintiffs are not pursuing any state law claims.

policy and custom permitting unlawful entries, arrests, and excessive force and failing to adequately train its police officers. *Id*. Defendants argue that the officers are entitled to summary judgment under qualified immunity because they did not violate the plaintiffs' clearly established rights. ECF No. 17. They also argue that the City is entitled to summary judgment because plaintiffs offer no evidence that it maintained policies or customs allowing for unconstitutional police officer conduct or that it failed to train its officers to avoid unlawful entries, arrests, and use of force. ECF No. 29, PageID.908-09.

## III.   ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(a). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516–17 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)). In reviewing a motion for summary judgment, courts are to "view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Williams v. Mauer*, 9 F.4th

416, 430 (6th Cir. 2021) (citation omitted). The ultimate question for the court to determine "is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pham. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

When events at issue are captured on video, courts are to "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). But if the video evidence "can be interpreted in multiple ways or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). Viewing the facts in this manner, if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56.

### B. Defendant Officers

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams*, 9 F.4th at 430 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity at the summary judgment stage applies "unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id*. (citation omitted); *see also Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659–60 (6th Cir. 2021). If defendants raise qualified immunity on summary judgment, the plaintiff bears the burden of showing that a defendant is not entitled to it. *Williams*, 9 F.4th at 430 (citing *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)).

Although on summary judgment this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right. *Id*. at 430–31 (citing *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020)).

Plaintiffs assert three Fourth Amendment violations against defendant officers: unjustified warrantless entry into Ferguson's yard and house; their unlawful arrest or seizure of Ferguson and Ferguson, Jr.; and their use of excessive force in effectuating those arrests. ECF Nos. 1, 28.

### 1. Warrantless Entry

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend IV. "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585-86 (1980). "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). Accordingly, a police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. *Barton*, 949 F.3d at 948 (citation omitted).[4]

---

[4] A fenced-in yard has long been defined as within a home's curtilage and thus within the protection of the Fourth Amendment. *United States v. Dunn*, 480 U.S. 294, 302 (1987).

Nevertheless, "the Fourth Amendment does not prohibit all unwelcome intrusions on private property—only the unreasonable ones." *Williams*, 9 F.4th at 431 (quoting *Caniglia v. Strom*, 593 U.S. 194, 198 (2021)) (cleaned up). Certain "exigent circumstances" permit warrantless entries into a home. *Barton*, 949 F.3d at 948. "Exigent circumstances exist when a reasonable officer could believe there are real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Id*. (internal quotation marks omitted). Whether exigent circumstances exist is "typically a question for the jury[,]… [however], the issue may be decided as a matter of law when a fact finder could only reach one conclusion on the undisputed facts." *Stricker v. Township of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013) (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)).

Defendants argue that the officers did not violate Ferguson's constitutional right against warrantless entry because the situation posed an imminent danger to the officers thereby creating the exigent circumstances permitting them to enter his property without a warrant. ECF No. 17, PageID.113.

A suspect posing an immediate threat to an arresting officer or the public may constitute exigent circumstances. *Barton*, 949 F.3d at 948. The

relevant inquiry for courts to make "is whether the facts were such that an objectively reasonable officer confronted with the same circumstances could reasonably believe exigent circumstances existed." *Ewolski*, 287 F.3d at 501. "Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency." *Barton*, 949 F.3d at 948 (quoting *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996)). Police must have "information that the suspect is armed and likely to use a weapon or become violent." *Id*. at 949 (quoting *Bates*, 84 F.3d at 795). Even "officers responding to a shots-fired report must have additional evidence of an immediate threat before entering a home without a warrant." *Id*.

Prior to the officers entering his yard, Ferguson neither acted against nor threatened the officers. In fact, aside from refusing the leave his yard, he had fully cooperated with them during their questioning. Notwithstanding Behr's accusations, Ferguson denied pointing a gun at or threatening Behr and denied owning anything other than a shotgun. The neighbor who witnessed some of the altercation between Behr and Ferguson denied seeing a weapon, corroborated parts of Ferguson's account (that Behr raced up the driveway in an aggressive manner), and contradicted important aspects of Behr's version of the story (that Ferguson approached to within three feet of Behr's truck). Defendant officers had evidence that

another adult member of the household, who was not outside with the others present during their interview of Ferguson, had a handgun registered in his name. At most, the defendant officers had a reasonable suspicion that there was a handgun matching Behr's description in the Ferguson house. That suspicion alone falls far short of showing the immediate threat of danger necessary to establish exigent circumstances and justify a warrantless entry. *See id*. (citing *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997-98 (6th Cir. 1994)).

Defendants next argue that the officers legally entered the property without a warrant because they were in hot pursuit of a fleeing felon. ECF No. 17, PageID.113-14. Indeed, "the 'hot pursuit' justification has been recognized as an exception to traditional search and seizure law." *Coffey v. Carroll*, 933 F.3d 577, 586 (6th Cir. 2019). The exception applies "where an officer without a warrant justifiably chases a suspect into a private home when the criminal has fled arrest in a public place." *Id*. (citing *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967)). "The 'pursuit' begins when police start to arrest a suspect in a public place, the suspect flees and the officers give chase." *Smith v Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013) (citing *Cummings v. City of Akron*, 418 F.3d 676, 686 (6th Cir. 2005)). Pursuit in this context "is defined as an effort to catch and detain and individual

following an attempted arrest and subsequent escape." *Coffey*, 933 F.3d at 586. The emergent nature of a situation, creating the need for immediate police action, turns an ordinary pursuit into a "hot" one and justifies a warrantless entry under the exigency exception. *Id.* (citing *Cummings*, 418 F.3d at 686).

Here the defendant officers' entry into Ferguson's yard and home does not qualify as a 'hot pursuit' for purposes of an exigency exception to the warrant requirement. First, the defendant officers were not in pursuit of Ferguson. Ferguson voluntarily talked with the defendant officers from within his fenced-in yard. The defendant officers never attempted to arrest him before the warrantless entry; indeed, recognizing that they needed a search warrant for entry, they merely requested that he step outside of his yard. Ferguson refused the request by walking away from the fence to return to his house. "To call that choice 'flight' would make a fugitive out of any citizen who exercises his right to end a voluntary conversation with a police officer." *See Stoneburner*, 716 F.3d at 932. Ferguson had the right to refuse further questioning and go inside his house. *See id*. (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)).

Moreover, even if it could be deemed a pursuit, the situation could not in any way be considered "hot" because "no emergency necessitated

immediate police action." *Id*. (quoting *Cummings*, 418 F.3d at 686) (internal marks omitted). As discussed above, there was no threat to the officers. Nor was there a threat to the public. Even if the officers fully credited Behr's accusations, Ferguson threatened to shoot Behr only if Behr did not vacate his property, a demand with which Behr immediately complied. Any remote risk to the public would have been mediated by the defendant officers remaining outside while they waited for a search warrant. *See id*.

Defendants rely on *United States v. Santana* to support their argument that the hot pursuit exigency justified the officers' warrantless entry of Ferguson's home. 427 U.S. 38, 43 (1976). But *Santana* is distinguishable. In *Santana*, the police followed the defendant into her home to complete a drug-trafficking arrest initiated while was she just outside her house. *Id*. The court found the house's entryway was sufficiently within public view to be considered public for the purpose of initiating a warrantless arrest. That defendant's arrest began in public, coupled with the need for the police to act quickly to prevent the destruction of evidence once she was inside the house, qualified as a "hot pursuit" exigency and justified the warrantless entry of the defendant's home. *Id*.

In contrast here, the defendant officers never told Ferguson he was under arrest before they opened the gate, entered his yard, and pursued

him into his house. *See Stoneburner*, 716 F.3d at 931 (distinguishing *Santana*, 427 U.S. at 43). Accordingly, his arrest did not begin in a public place. The *Stoneburner* court found this distinction critical; it reasoned that had the officer told the suspect he was under arrest while outside on the deck, and had the suspect made a run for it, the officer could perhaps have pursued the suspect into his house without a warrant under the hot pursuit exigency. *Id*. Like the officer in *Stoneburner*, the defendant officers here did not initiate Ferguson's arrest in a public place. Accordingly, Ferguson was free to retreat to his house, and the officers were required to get a warrant to arrest him inside his fenced-in yard or home. *See id*. at 932.

In further contrast to *Santana*, the defendants here do not contend nor does the record suggest a risk of evidence destruction as an emergency requiring immediate police action. Unlike drugs or currency, a handgun, the evidence purportedly inside the Ferguson house, could not be flushed down the toilet, quickly incinerated, or otherwise readily destroyed or disposed of without leaving the house. Without a need to prevent the destruction of evidence, or any other exigency requiring immediate police action, there can be no hot pursuit justification for the defendant officers' warrantless entry.

Viewing the facts from a reasonable officer's perspective at the time of the incident, and drawing all inferences in favor of Ferguson, no exigent circumstances precluded the officers from seeking a warrant before entering Ferguson's home.

Further, Ferguson's Fourth Amendment right to be free from a warrantless police entry under these circumstances was clearly established in September 2022, when this incident occurred. Warrantless entry into a home without an exception to the warrant requirement violates clearly established law. *Williams*, 9 F.4th at 437-38 (citing *Barton*, 949 F.3d at 949). That evidence of firearms within a residence, without more, is not sufficient to create an exigency exception to the warrant requirement was clearly established no later than 2020 by *Barton*. 949 F.3d at 948. That the "hot pursuit" exception to the warrant requirement requires both a "pursuit"—defined as an effort to catch and detain an individual following an attempted arrest in a public place—and that the pursuit be "hot," or so emergent in nature that immediate police action is necessary, has been clearly established since at least 2013. *See Stoneburner*, 716 F.3d at 932.

In summary, defendant officers did not have a warrant to enter Ferguson's yard or home, and no exigent circumstances applied to justify their entrance without a warrant. The defendant officers' entry into the yard

and house was thus an unlawful warrantless entry in clear violation of Ferguson's Fourth Amendment rights. Defendant officers are not entitled to qualified immunity on summary judgment.

### 2. Unlawful Arrest

To arrest a person in his home, police officers need either a warrant or exigent circumstances as well as probable cause. *Goodwin v. City of Painesville*, 781 F.3d 314, 327 (6th Cir. 2015). Plaintiffs assert in their complaint that defendant officers violated the Fourth Amendment by arresting them without probable cause. ECF No. 1, PageID.16. Defendant officers argue that the victim's statement, the LIEN check, and Ferguson's false denial of having a handgun in the house provided probable cause to arrest him for felonious assault. ECF No. 17, PageID.111. They also argue that they had probable cause to arrest Ferguson, Jr. for resisting and obstructing and assault after he grabbed Stellini around the waist when the officers entered the yard in pursuit of Ferguson. *Id*. Defendants likewise assert that they are entitled to qualified immunity for plaintiffs' false arrest claims. ECF No. 29, PageID.908.

As previously noted, if defendants raise qualified immunity on summary judgment, the plaintiff must show that a defendant is not entitled to it. *Williams*, 9 F.4th at 430. The defendant bears the initial burden of

coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question. *Id*. Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). The plaintiff must show facts and inferences that would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right. *Williams*, 9 F.4th at 430–31 (citing *Barton*, 949 F.3d at 947).

By citing to the specific and articulable facts they relied upon to determine they had probable cause to arrest plaintiffs, as well as relevant case law, the defendant officers met their initial burden of coming forward with facts to support they acted within the scope of their discretionary authority by arresting plaintiffs. *See* ECF No. 17, PageID.110-11. Although plaintiffs reiterate their allegations that defendant officers arrested them without probable cause, *see* ECF No. 28, PageID.725, they offer no facts and cite no law to contest that the defendant officers reasonably believed they had probable cause to arrest them given the information they possessed at the time. *See Scheffler v. Lee*, 752 F. App'x 239, 244 (6th

Cir. 2018). Plaintiffs have thus failed to meet their burden to establish that defendant officers arrested them without probable cause and that any officers in their position would have clearly understood that they lacked the probable cause necessary to effectuate a warrantless arrest. On this basis, defendant officers are entitled to qualified immunity on plaintiffs' wrongful arrest claims.

### 3. Excessive Force

To determine whether force was excessive, courts "apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (internal quotation marks omitted) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)). Three factors guide the reasonableness test: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Burgess*, 735

F.3d at 472. And, "[t]hough important, these factors are not the end of the matter, as the court ultimately must determine whether the totality of the circumstances justifies a particular sort of seizure." *Williams*, 9 F.4th at 438 (quotation marks omitted).

　　a.　Excessive Force against Ferguson

　　　　i. Monaco

Ferguson alleges that defendants used excessive force against him when they tasered him. Monaco asserts that the use of his Taser against Ferguson was not excessive force because Ferguson posed an immediate threat to officer safety and was actively resisting Cates by attempting to choke him when he applied his Taser.

"[A]n officer can tase a suspect who 'actively resists arrest ... to subdue him.'" *Jackson-Gibson v. Beasley*, 118 F.4th 848, 856 (6th Cir. 2024) (quoting *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015)). "Active resistance includes 'physically struggling with, threatening, or disobeying officers.'" *Rudlaff*, 791 F.3d at 641 (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)); *see also Kent v. Oakland Cnty.*, 810 F.3d 384, 392 (6th Cir. 2016) (stating that in "taser cases" "active resistance could be characterized as 'noncompliance,'" "coupled

with 'some outward manifestation—either verbal or physical—on the part of the suspect [that] suggest[s] volitional and conscious defiance'").

Based on the record here, the Court finds that Monaco did not use excessive force in deploying his Taser at Ferguson. There is no genuine dispute that Ferguson was actively resisting Cates when Monaco tased him. Ferguson never denies attempting to choke Cates; in fact, he admits that he was choking Cates after he entered Ferguson's home, that Cates shouted to Monaco that Ferguson was choking him, and that he continued to choke Cates as Monaco entered the house. ECF No. 17-6, PageID.254, 259, 261-62. Under these circumstances, Monaco's use of his Taser against Ferguson was objectively reasonable and did not violate Ferguson's constitutional rights. Accordingly, Monaco is entitled to summary judgment on Ferguson's excessive force claim against him.

ii. Cates

Cates argues that his pushing and pulling Ferguson in his effort to subdue and handcuff him, as well as his rolling him over on the ground, removing his pocketknife from his pants pocket, and dragging him out of the house did not amount to excessive force. He also argues that the officers' bodycam footage does not show Cates applying any other force to Ferguson.

The Court's review of the video evidence suggests otherwise. Following the application of Monaco's Taser, Ferguson was immobilized in a reclined position between a wall and a bookcase and on top of a basket and other household items over which he had fallen. ECF No. 17-4, 36:26. Both his hands were fully visible in front of him, and he was holding a water bottle in his right hand. *Id.* at 36:29. Monaco exited the house, evidencing his belief that any threat posed by Ferguson had been sufficiently neutralized to leave him alone with Cates. *Id.* Nevertheless, Cates unholstered and pointed his gun at Ferguson as he approached him and pulled him forward by his neck. *Id.* at 36:30-51. With Ferguson largely motionless in a prone position, his arms underneath him, Cates deployed his Taser directly into Ferguson's back until Cates secured Ferguson's hands behind his back. *Id.* at 36:59-37:06; *see also* ECF No. 17-3, 32:56 (Cates heard telling Ferguson he will be Tased again on Monaco's bodycam audio). After handcuffing Ferguson, Cates dragged him across the floor, partially out the sliding glass door, onto his deck as Ferguson screamed in pain, explaining that he has a severe bad back and asking to be taken to the hospital. *Id.* at 33:44-34:30.

"An officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain

a claim of excessive force." *Wright v. City of Euclid*, 962 F.3d 852, 866 (6th Cir. 2020) (quoting *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) (internal marks omitted)). Based on the video evidence described above, a reasonable jury could certainly conclude that Ferguson posed no threat to Cates when Cates pointed his gun at him. Accordingly, whether Cates was justified in brandishing his firearm is a genuine dispute which must be resolved by a jury. *See id*.

Likewise, a reasonable jury could find that Cates's use of his Taser on the prone and inactive Ferguson was objectively unreasonable and thus violated his Fourth Amendment right to be free from excessive force. As discussed above, an officer can tase a suspect who is actively resisting arrest. *Jackson-Gibson*, 118 F.4th at 856. However, an officer cannot tase a suspect who does not actively resist arrest or who has stopped resisting arrest. *Id*. (citing *Rudlaff*, 791 F.3d at 642). Critically, "when a suspect passively resists arrest by refusing to comply, an officer cannot use a taser to compel compliance." *Id*. (citing *Goodwin*, 781 F.3d at 323). If a "suspect does not immediately surrender[, it] does not inherently mean that he is resisting." *Id*. (quoting *LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022)). A suspect can stop actively resisting arrest by doing nothing. *Id*. (citing *Rudlaff*, 791 F.3d at 641). "In other words, 'when

individuals behave nonviolently and are merely noncompliant,…they are only passively resisting arrest, which weighs against the reasonableness of a use of force.'" *Id*. (quoting *Saalim v. Walmart, Inc*., 97 F.4th 995, 1005 (6th Cir. 2024)). Active resistance, however, requires "some outward manifestation—either verbal or physical" to suggest volitional and conscious defiance on the part of the subject. *Id*. (quoting *Shumate v. City of Adrian*, 44 F.4th 427, 446 (6th Cir. 2022)).

Viewing the evidence in Ferguson's favor, he did not physically manifest "volitional and conscious defiance." *Id*. The video evidence does not show Ferguson actively resisting by physically pulling away to avoid arrest. *See* ECF No. 17-4, 36:26-37:06. Nor is there evidence of verbal defiance from Ferguson at that point.[5] *See id.*, 36:30-37:06. Cates can be heard (on Monaco's bodycam) repeatedly demanding Ferguson give him his hands to be handcuffed, ECF No. 17-3, 32:36-39, 32:48, 32:57-33:05, 33:17, but the Sixth Circuit has "previously 'elaborated that a failure to present one's arms to an officer upon request without more constitutes passive resistance at most.'" *Jackson-Gibson*, 118 F.4th at 856 (quoting *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024)).

---

[5] As noted earlier, this portion of the bodycam footage from Cates is without audio.

Based on this evidence, a reasonable jury could conclude that Ferguson was at most engaged in passive resistance such that Cates's use of his Taser on him was objectively unreasonable and thus constituted excessive force. Cates is not entitled to qualified immunity[6] for Ferguson's excessive force claim, and defendants' motion for summary judgment must therefore be denied as to this claim.

      b. Excessive Force against Ferguson, Jr.

Plaintiffs do not distinguish between defendants in their assertion that the officers used excessive force against Ferguson, Jr.

      i. Stellini

Stellini argues that, as a matter of law, the force he used against Ferguson, Jr. was not excessive because the bodycam footage shows Stellini merely responded to the immediate threat posed by Ferguson, Jr. attempting to grab Stellini as he entered the yard. ECF No. 17, PageID.116. Notwithstanding defendants' characterization of the video evidence, the Court's review of the officers' bodycam footage suggests an alternate narrative. As Stellini opens the gate, Ferguson, Jr., appears to

---

[6] The Sixth Circuit determined that an individual's right not to be tased when he is not actively resisting was clearly established in the circuit by 2019. *Jackson-Gibson*, 118 F.4th at 858.

lunge toward it to keep Stellini from entering the yard.[7] ECF No. 17-3, 32:19-20. Stellini continues to force open the gate, gripped by Ferguson, Jr. with his extended left hand, and pushes into Ferguson, Jr. *Id.* at 32:20. Stellini and Ferguson, Jr. seem to collide, and Ferguson, Jr.'s right arm briefly comes around Stellini's waist. *Id.* at 32:21. Stellini testified that Ferguson Jr.'s shoulder impacted him, but a reasonable jury could conclude from the video evidence that Stellini's forward momentum carried him into Ferguson, Jr. and continued to push him backwards, eventually breaking his grip on the gate and driving him into the wall of the house. *Id.*

If a police officer forcibly enters a home "armed with neither a warrant nor an exception to the warrant requirement, the use of any amount of force to effectuate this unconstitutional action constitute[s] unreasonable gratuitous violence," and violates the Fourth Amendment right to be free from excessive force. *Williams*, 9 F.4th at 440 (citing *Walters v. Stafford*, 317 F. App'x 479, 491 (6th Cir. 2009)).

*Williams* is instructive. The plaintiff partially opened the door to defendant officers but blocked the door with her knee to prevent it from opening further. *Id.* at 438.  Defendant officers forcibly pushed open the

---

[7] During oral argument, counsel for defendants likewise described Ferguson Jr.'s action as forcing the gate closed to prevent defendant officers' entry.

Page **30** of **38**

door, injuring plaintiff's knee. *Id*. The court ruled that the force used to open the door blocked by plaintiff's knee was excessive because it was used to enter her home without a warrant or an exception to the warrant requirement. *Id*. at 440.

Here too, as discussed above, defendant officers entered Ferguson's yard without a warrant or an exception to its requirement. A reasonable jury could conclude from the bodycam footage that Ferguson, Jr. was lawfully attempting to assert his Fourth Amendment right to be free from an unreasonable search and seizure when he lunged for and held onto the gate, and thus the force Stellini used to push the gate into Ferguson, Jr. was excessive.

Having determined that Ferguson, Jr. has made a sufficient showing that Stellini violated his Fourth Amendment right to be free from excessive force, the inquiry turns to whether the right was clearly established. It is "clearly established that warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law." *Barton*, 949 F.3d at 949. Likewise, it is clearly established that if defendants have no right to be inside the home, then they have no right to use force to enter. *Williams*, 9 F.4th at 440 (citing *Walters*, 317 F. App'x at 491).

As discussed above, Stellini had no right to be inside the yard, and thus had no right to use force to enter. Accordingly, viewing the evidence in the light most favorable to plaintiffs, when Stellini forced open the gate, shoving Ferguson, Jr. backwards into the exterior wall of the house, Stellini violated Ferguson, Jr.'s clearly established Fourth Amendment right to be free from excessive force. At a minimum, questions of fact exist as to whether Stellini is entitled to qualified immunity on Ferguson, Jr.'s excessive force claim and thus he is not entitled to summary judgment.

ii. Monaco

Defendants argue that Monaco's deployment of his Taser at Ferguson, Jr. before Ferguson, Jr. put his hands up and while he was on top of Stellini was objectively reasonable. ECF No. 17, PageID.116-17. Plaintiffs argue that Monaco's actions were not objectively reasonable because Ferguson, Jr. had surrendered and was not a threat to the officers. ECF No. 28, PageID.740.

"There is no clearly established right for a suspect who actively resists…to be free from a Taser application." *Goodwin*, 781 F.3d at 325 (internal quotation omitted). However, "application of a Taser to a suspect who has ceased virtually all resistance constitutes excessive force, even if the suspect had resisted violently earlier in the encounter." *Id*. at 327.

Thus, whether Monaco's actions amounted to excessive force hinges on whether Ferguson, Jr. was actively resisting Stellini when Monaco deployed his Taser at him. The bodycam footage reveals that when Monaco returned to the yard from the house, Stellini had Ferguson, Jr. in a chokehold and had one arm hooked. ECF No. 17-3, 32:37. But Ferguson, Jr. continued to struggle to break free from Stellini even after they both fell backwards to the ground. *Id*. at 32:37-40. As Monaco bore down on them with his Taser pointed at Ferguson, Jr., Ferguson, Jr. raised his hands and yelled, "all right, all right." *Id*. at 32:40. Monaco deployed his Taser at Ferguson, Jr. less than a second after his apparent surrender. *Id*. at 32:40-41.

> [T]he "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." In some contexts this would counsel against holding an officer to a standard where it is necessary to evaluate changes in a suspect's behavior over a period of seconds…

*Goodwin*, 781 F.3d at 328 (quoting *Graham*, 490 U.S. at 396–97).

Here, Monaco faced the very circumstance anticipated by *Goodwin* and *Graham*. *Id*.; *Graham*, 490 U.S. at 396-97. Chaos erupted after Stellini opened the gate to Ferguson's yard. Stellini had been trying to subdue Ferguson, Jr. the entire time Monaco had been in the house

with Cates and Ferguson. Ferguson, Jr. struggled against Stellini's

physical restraint for the approximately three seconds it took Monaco

to reach them. Ferguson, Jr. eventually raised his hands and called

out in surrender but did so nearly simultaneously with Monaco

deploying his Taser. These conditions required Monaco to evaluate a

change in Ferguson, Jr.'s behavior not over a period of seconds but

in less than one second. The Court finds that Monaco's use of his

Taser on Ferguson, Jr. was objectively reasonable under the

circumstances—Ferguson, Jr. had been actively resisting less than a

second before Monaco tased him—and was not excessive force.

Accordingly, Monaco is entitled to qualified immunity and summary

judgment on Ferguson Jr.'s excessive force claim.

### C. Defendant City (*Monell* Claim)

Plaintiffs also assert claims against the City under § 1983, arguing

that its municipal policy or custom was the moving force behind their

injuries. Plaintiffs contend that the City's failure to train its officers

evidences a deliberate indifference to the rights of its inhabitants and thus

constitutes an actionable official policy. ECF No. 28, PageID.745-46. The

City argues it is entitled to summary judgment because plaintiffs did not

meet their burden of identifying the offending policy and showing how the execution of that policy injured them. ECF No. 29, PageID.908-09.

To establish municipal liability under *Monell*, "a plaintiff must prove: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of or acquiescence to federal rights violations." *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019) (internal quotation and marks omitted). Plaintiffs appear to advance a theory of the City's liability for defendant officers' actions under the third and fourth prongs.

"To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-287 (6th Cir. 2020) (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

As the court explained in *Ouza*, there are "at least two situations in which inadequate training could be found to be the result of deliberate

indifference." *Id.* at 287 (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). First, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act "in response to repeated complaints of constitutional violations by its officers." *Id.* (citation omitted). Second, in a "narrow range of circumstances," a plaintiff can show that a municipality was deliberately indifferent with a single incident. *Connick*, 563 U.S. at 63. Although rare, the unconstitutional consequences of failing to train can be so patently obvious that a municipality could be liable under § 1983 without proof of a pre-existing pattern of violations. *Id.* at 64.

Plaintiffs do not argue and offer no evidence that the City has shown deliberate indifference by failing to act "in response to repeated complaints of constitutional violations by its officers." *Ouza*, 969 F.3d at 287. Nor have they argued that this single incident fits within that "narrow range of circumstances" that permit a plaintiff to establish a municipality's deliberate indifference without proof of a pre-existing pattern of violations. *Connick,* 563 U.S. at 64. Accordingly, plaintiffs have failed to demonstrate the existence of a policy of inadequate training or supervision as a basis for the City's liability under *Monell*.

> To succeed on a custom of tolerance or acquiescence claim, a plaintiff must prove: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the

part of the municipality; (3) the municipality's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the municipality's custom was the moving force or direct causal link in the constitutional deprivation.

*Stewart*, 788 F. App'x at 347-48 (6th Cir. 2019) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)) (quotation marks omitted). A custom of tolerance claim fails if the plaintiff fails to prove any of the four elements. *Id.* at 347.

Plaintiffs do not argue or identify evidence pointing to the existence of a clear and persistent pattern of illegal activity by the City's officers. Plaintiffs' failure to establish the first element of the custom or acquiescence theory defeats their municipal liability claim against the City. Thus, the City is entitled to summary judgment in its favor on the *Monell* claim.

## IV. CONCLUSION

For these reasons, defendants' motion for summary judgment (ECF No. 17) is **GRANTED** as to the City, as to the unlawful arrest claims against all defendant officers, and as to the excessive force claims against Monaco. The motion is **DENIED** as to the unlawful entry claims against all defendant officers, and the excessive force claims against Stellini and Cates.

Plaintiffs' claims against the City are **DISMISSED**. Plaintiffs' unlawful arrest claims against all defendants and their excessive force claims against Monaco are likewise **DISMISSED**. Ferguson's claims against all defendant officers for unlawful entry and against Cates for excessive force, and Ferguson, Jr.'s claim against Stellini for excessive force will proceed to trial.

**IT IS SO ORDERED.**

s/Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge

Dated: March 18, 2025